# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 15, 2020          Decided December 29, 2020

No. 20-5193

AMERICAN HOSPITAL ASSOCIATION, ET AL.,
APPELLANTS

v.

ALEX M. AZAR, II, IN HIS OFFICIAL CAPACITY AS SECRETARY
OF HEALTH AND HUMAN SERVICES,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cv-03619)

*Lisa S. Blatt* argued the cause for appellants. With her on the briefs was *Whitney D. Hermandorfer*.

*Chad I. Golder* was on the brief for *amici curiae* Forty State Hospital Associations in support of appellants.

*Benjamin G. Shatz* was on the brief for *amicus curiae* Healthcare Financial Management Association in support of appellants.

*Daryl L. Joseffer*, *Tara S. Morrissey*, *Jeffrey S. Bucholtz*, and *Joel McElvain* were on the brief for *amicus curiae*

Chamber of Commerce of the United States of America in support of appellants.

*Courtney L. Dixon*, Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief were *Ethan P. Davis*, Acting Assistant Attorney General, *Scott R. McIntosh*, Attorney, *Robert P. Charrow*, General Counsel, U.S. Department of Health & Human Services, *Brenna E. Jenny*, Deputy General Counsel & Chief Legal Officer-CMS.

*Robert Henneke* and *Jeffrey M. Harris* were on the brief for *amici curiae* Texas Public Policy Foundation, et al. in support of appellee.

Before: TATEL and GARLAND[*], *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: As part of the Affordable Care Act, Congress required hospitals to make public "a list" of "standard charges" in accordance with guidelines developed by the Secretary of Health and Human Services. 42 U.S.C. § 300gg-18(e). By rule, the Secretary defined "standard charges" to include prices that hospitals charge insurers. The American Hospital Association and others challenge the rule, arguing that it violates the statute, the Administrative Procedure Act, and the First Amendment. For the reasons set forth in this opinion, we affirm the district court's grant of summary judgment to the Secretary.

---

[*] Judge Garland was a member of the panel at the time this case was argued but did not participate in the final disposition of the case.

**I.**

Understanding the issues before us requires an explanation of how hospitals charge for their services. In short, their charges look nothing like hotel room rates or car prices. Rather, hospitals charge different amounts for the same item or service depending on who is paying.

Three different groups pay hospitals for care: patients, insurers, and the federal and state governments (for Medicare and Medicaid). The first group, "self-pay" patients, pay directly for their care because they have no insurance, receive elective or out-of-network care, or believe that paying directly is cheaper than relying on insurance. Self-pay patients account for fewer than 10 percent of all patients. *Price Transparency Requirements for Hospitals to Make Standard Charges Public* (*Price Transparency Requirements*), 84 Fed. Reg. 65,524, 65,542 (Nov. 27, 2019). Hospitals generally charge these patients rates specified in what is called "chargemasters," which list all items and services provided by each hospital with their "gross charges." *Id.* at 65,537. Many hospitals offer discounts to self-pay patients based on standardized cash discounts or individual financial need (or both). As a result, chargemaster rates are "virtually never what hospitals ultimately receive as payment." Appellants' Br. 7. Although these gross charges "bear little relationship to market rates [and] are usually highly inflated," *Price Transparency Requirements*, 84 Fed. Reg. at 65,538, they exist for "historical and legal reasons," Appellants' Br. 7–8. Specifically, Medicare requires hospitals' charges for Medicare and non-Medicare patients to be the same for a specific service, and hospitals comply with that requirement by listing chargemaster rates as if they were applicable to everyone, even though hospitals receive different payments depending on the payer's identity.

Over ninety percent of patients rely on third-party payers, i.e., insurers, Medicaid, and Medicare. Medicaid and Medicare pay hospitals based on rates set by the states and the Centers for Medicare & Medicaid Services. Those rates are public. *Price Transparency Requirements*, 84 Fed. Reg. at 65,542, 65,552. Insurance companies have contractual agreements with hospitals to pay negotiated rates for their services. Although insurers and hospitals often treat chargemaster rates as the "starting point" for negotiations, negotiated rates are a product of a wide range of methodologies. Appellants' Br. 8. Insurers may pay fixed fees for individual items and services, or they may pay for bundled packages based on common procedures, per diem rates, or other variable factors, set out in "many dozens of pages of text." *Id.* at 8 (internal quotation marks omitted). They may also pay according to a "diagnosis-related group" methodology, under which a rate is established for a group of hospital items and services based on the typical care provided to a patient with a particular diagnosis. The Medicare statute requires diagnosis-related-group classifications for inpatient Medicare reimbursements, and some private insurers use these classifications to establish rates with hospitals. 42 U.S.C § 1395ww(d)(4); *Price Transparency Requirements*, 84 Fed. Reg. at 65,534. In addition, insurers may pay different amounts based on volume discounts, incentive payments for meeting quality metrics, and exclusions for certain services.

With so many different methodologies for setting rates, determining what negotiated rate applies to a particular patient for a particular item or service is "exceedingly complex." Appellants' Br. 8. Adding to the complexity, negotiated rates are not necessarily what insured patients would pay, as their out-of-pocket costs depend on their health insurance plan, which has its own rules on copays, deductibles, and coverage limits.

Patients usually learn what a given hospital service cost only after the fact, either from a hospital bill or an "Explanation of Benefits" form from their insurance company; the latter details the insurer's negotiated rates and the patient's out-of-pocket costs. Patients are "understandably frustrated by their inability to easily determine in advance what they may pay out-of-pocket for hospital services." *Id.* at 6. According to the Secretary, this lack of price transparency has contributed to an "upward spending trajectory" in healthcare. *Price Transparency Requirements*, 84 Fed. Reg. at 65,525–26.

Against this backdrop, Congress passed the Affordable Care Act of 2010, which added section 2718, entitled "Bringing down the cost of health care coverage," to the Public Health Service Act. In language central to this case, subsection 2718(e) requires "[e]ach hospital operating within the United States" to "each year establish (and update) and make public (in accordance with guidelines developed by the Secretary) a list of the hospital's standard charges for items and services provided by the hospital, including for diagnosis-related groups established under [the Medicare reimbursement statute]." 42 U.S.C. § 300gg-18(e). The statute nowhere defines "standard charges."

Following passage of the Affordable Care Act, the Secretary allowed hospitals to comply with section 2718(e) by making their chargemasters public. *Transparency Requirement Under the Affordable Care Act*, 79 Fed. Reg. 49,854, 50,146 (Aug. 22, 2014). But in 2018, the Secretary found that "challenges continue to exist for patients due to insufficient price transparency" because chargemaster data were "not helpful to patients for determining what they are likely to pay for a particular service or hospital stay." *Requirements for Hospitals to Make Public a List of Their Standard Charges via the Internet*, 83 Fed. Reg. 20,164, 20,549 (May 7, 2018). As a

result, the Secretary required hospitals to make their chargemasters available online in a machine-readable format. He also sought public comment on how "standard charges" should be defined and "what types of information would be most beneficial to patients." *Id.*

In June 2019, President Trump issued an Executive Order titled "Improving Price and Quality Transparency in American Healthcare to Put Patients First." Exec. Order No. 13,877, 84 Fed. Reg. 30,849 (June 24, 2019). The Executive Order directed the Secretary to "propose a regulation, consistent with applicable law, to require hospitals to publicly post standard charge information, including charges and information based on negotiated rates and for common or shoppable items and services." *Id.* at 30,850. Two months later, the Secretary issued a notice of proposed rulemaking, which explained that despite the existing requirements to post their chargemaster rates online, "consumers continue to lack the meaningful pricing information they need." *Proposed Requirements for Hospitals to Make Public a List of Their Standard Charges*, 84 Fed. Reg. 39,398, 39,571, 39,574 (Aug. 9, 2019). The Secretary proposed requiring hospitals to disclose not just chargemaster rates, but also "payer-specific negotiated charges" for their items, and to disclose them in two different ways: a single digital file containing charges for all items and services, and a "consumer-friendly" list of charges for three hundred "shoppable" services, defined as services that can be scheduled in advance, *id.* at 39,402, 39,579–80, 39,589–90, "like a colonoscopy," Appellants' Br. 56. The notice estimated that compliance with the rule would require twelve hours per hospital and proposed an effective date of January 1, 2020. *Proposed Requirements for Hospitals to Make Public a List of Their Standard Charges*, 84 Fed. Reg. at 39,400, 39,403.

After receiving nearly four thousand comments, the Secretary issued a final rule that defines "standard charge" as "the regular rate established by the hospital for an item or service provided to a specific group of paying patients." *Price Transparency Requirements*, 84 Fed. Reg. 65,524, 65,540 (Nov. 27, 2019). To qualify as a "regular rate," the rate must be formalized in advance—e.g., through hospital contracts or fee schedules—and there must be an "identifiable" group of patients for whom that rate would usually apply. *Id*. at 65,546, 65,539, 65,542. The rule lists five categories of standard charges that hospitals must disclose: gross charges from chargemasters; payer-specific negotiated charges; standardized discounted cash prices offered to self-pay patients before any individualized discounts; and maximum and minimum third-party negotiated charges for a given item or service, without identifying the specific payer ("de-identified minimum . . . and maximum negotiated charge[s]"). *Id*. at 65,540. In response to comments, the Secretary waived the three hundred shoppable services list requirement for hospitals already providing internet-based price estimator tools for patients. *Id.* at 65,577. The Secretary also revised the initial compliance burden estimate up to 150 hours per hospital in the first year and 46 hours per hospital in subsequent years. *Id.* at 65,591–94, 65,596. Finally, persuaded that "some hospitals may find it challenging to initially comply with the new requirements . . . in a short timeframe," the Secretary delayed the rule's effective date by one year to January 1, 2021. *Id.* at 65,585.

The American Hospital Association, joined by other associations, individual hospitals, and hospital systems (collectively, the "Association"), filed suit, arguing that the rule's interpretation of "standard charges" violates section 2718(e), the APA, and the First Amendment. The district court granted summary judgment to the Secretary on all three claims. *American Hospital Ass'n v. Azar*, 468 F. Supp. 3d 372 (D.D.C.

2020). Our review is de novo. *See St. Luke's Hospital v. Thompson*, 355 F.3d 690, 693 (D.C. Cir. 2004).

**II.**

The Association argues that the rule rests on an unlawful interpretation of section 2718(e) and that no *Chevron* deference applies partly because the President, through his June 2019 Executive Order, "picked the definition of 'standard charges' that [the Secretary] adopted." Appellants' Br. 43. The Association even "question[s] the validity of *Chevron* deference," though it "recognize[s] the doctrine binds this Court." *Id.* at 41 n.10. The Secretary points out that he adopted his interpretation after notice-and-comment rulemaking and argues that his interpretation is the best one and at a minimum reasonable under *Chevron*.

Although we have no reason to doubt *Chevron*'s applicability, we need not decide that question here. Even if *Chevron* were inapplicable, we would "proceed to determine the meaning of" section 2718(e) by "decid[ing] for ourselves the best reading." *Miller v. Clinton*, 687 F.3d 1332, 1342 (D.C. Cir. 2012) (internal quotation marks omitted). Employing the traditional tools of statutory interpretation—text, structure, and purpose—and following the "'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme,'" we conclude that the best reading of section 2718(e), including the two statutory phrases at issue, i.e., "standard charges" and "a list," permits the Secretary to adopt the challenged rule. *Roberts v. Sea-Land Services, Inc.*, 566 U.S. 93, 101 (2012) (quoting *Davis v. Michigan Department of Treasury*, 489 U.S. 803, 809 (1989)); *see In re Sealed Case*, 932 F.3d 915, 928 (D.C. Cir. 2019).

9

***Standard Charges***

The Association focuses primarily on the rule's inclusion of negotiated rates among the "standard charges" that hospitals must disclose. Based on the dictionary definition of "standard" as usual, common, or model, it argues that the definition is "antithe[tical]" to the rule's inclusion of negotiated rates for identifiable patient groups as "standard charges." Appellants' Br. 27. Rather, the Association contends, the "most natural way" to interpret the term "standard charges" is to define it as the seller's list price—such as the manufacturer's suggested retail price for cars—or "a jumping-off point," even if few consumers pay the list price. *Id.* at 27, 32.

Viewed in its entirety, however, section 2718(e) is best interpreted as requiring disclosure of more than list prices. *See American Coal Co. v. Federal Mine Safety & Health Review Commission*, 796 F.3d 18, 25–26 (D.C. Cir. 2015) ("General-usage dictionaries cannot invariably control our consideration of statutory language, especially when the 'dictionary definition of . . . isolated words[] does not account for the governing statutory context.'" (alterations in original) (quoting *Bloate v. United States*, 559 U.S. 196, 205 n.9 (2010))). Recall that the provision requires hospitals to disclose "a list of the hospital's standard charges for items and services provided by the hospital, *including for diagnosis-related groups* established under [the Medicare reimbursement statute]." 42 U.S.C. § 300gg-18(e) (emphasis added). The "including for" clause gives an illustrative example of "standard charges." That is, the list must contain standard charges for items and services, as well as standard charges for *things like* "diagnosis-related groups" established under the Medicare statute, i.e., charges bundled for a given diagnosis as opposed to charges for individual items and services. *See Puerto Rico Maritime Shipping Authority v. Interstate Commerce Commission*, 645 F.2d 1102, 1112 n.26 (D.C. Cir. 1981) ("It is hornbook law that

the use of the word 'including' indicates that the specified list . . . that follows is illustrative, not exclusive."); *see also* Include, The Merriam-Webster Collegiate Dictionary 629 (11th ed. 2011) ("include" means "to take in or comprise as a part of a whole or group").  Reading the statute's "including for" clause as illustrative of charges that are bundled together and negotiated between hospitals and insurers, as does the Secretary, gives effect to "'every clause and word of [the] statute.'" *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955)). By contrast, the Association's interpretation—that the clause requires hospitals to disclose nothing more than already-public Medicare charges—not only renders it redundant of the Medicare statute's requirement that the Secretary make all Medicare charges public, but also conflicts with the rest of section 2718(e), which requires disclosure of each *hospital's* charges, not charges set by the Secretary.

Context and congressional purpose reinforce this reading. As to the former, because hospitals have numerous different charges that are formalized in contracts with third-party payers, rather than one "standard charge" applicable to all, or even most, patients, the dictionary definition of "standard" is unhelpful. The Association's contention that chargemaster rates represent "universal default prices irrespective of payer," Appellants' Reply Br. 3, moreover, is inconsistent with its assertion that hospitals have chargemaster rates simply to comply with the Medicare requirement that Medicare and non-Medicare patients be charged the same. *See* Appellants' Br. 7–8. Chargemaster rates, in other words, are neither universal nor default, except for purposes of complying with the letter of the Medicare rule. Given this context, the statute allows the Secretary to define standard charges more broadly as regular rates set in advance for identifiable groups of patients.

As to purpose, Congress enacted section 2718, as its title demonstrates, to "[b]ring[] down the cost of health care coverage." *See INS v. National Center for Immigrants' Rights, Inc.*, 502 U.S. 183, 189 (1991) ("[T]he title of a statute or section can aid in resolving an ambiguity in the legislation's text."). The Secretary was concerned that chargemaster rates, though previously treated as adequate for complying with section 2718(e), in fact failed to sufficiently inform patients of their costs. This is because, as the Association concedes, patients rarely pay chargemaster rates. Appellants' Br. 7; *Price Transparency Requirements*, 84 Fed. Reg. at 65,542. Given this, and given the Secretary's finding that requiring disclosure of negotiated rates will help more patients select hospitals with more affordable rates, the Secretary interpreted the undefined term "standard charges" in a way that best effectuates congressional intent to lower healthcare costs. The best reading of the statute is that it permits such an interpretation. *See PDK Laboratories, Inc. v. DEA*, 362 F.3d 786, 796 (D.C. Cir. 2004) ("The words of the statute should be read in context, . . . and the problem Congress sought to solve should be taken into account.").

The Association also challenges the rule's inclusion of discounted cash prices and de-identified maximum and minimum negotiated rates as standard charges. Focusing on the definition of the word "discounted," the Association contends that "a discount" is "by definition[] a departure from the norm" and therefore not "standard." Appellants' Br. 31. The rule, however, makes clear that the "discounted cash price" category refers only to standardized discounts that hospitals give to cash-paying patients and excludes individualized discounts based on financial circumstances. *Price Transparency Requirements*, 84 Fed. Reg. at 65,553. Defined that way, discounted cash price is a formalized rate that applies to a set group of patients regardless of individual circumstances, just

like third-party negotiated rates. As for the de-identified maximum and minimum negotiated rates, they are simply a subset of already-disclosed negotiated rates listed in separate columns. As explained above, section 2718(e) permits the Secretary to require disclosure of negotiated rates, and requiring hospitals to display certain datapoints separately falls squarely within the Secretary's authority to develop guidelines for making the list public.

### *A List*

Turning its attention to a different word in section 2718(e), the Association argues that the rule's requirement of both a comprehensive, machine-readable list of charges for all services and a separate, consumer-friendly shoppable services list runs afoul of section 2718(e)'s requirement that hospitals publish "*a* list" of standard charges. The Secretary, echoing his argument with respect to de-identified maximum and minimum charges, points out that the charge information in the shoppable services list is a subset of the information already made public in the comprehensive file. *Id.* at 65,575. For example, getting a colonoscopy may incur charges for anesthesia, a pathology lab service, and a facility fee. *Id*. at 65,566. Individual charges for those three components would already appear in the comprehensive list; the shoppable services list would group them together under the heading "colonoscopy."

To be sure, one could argue (as does the Association) that this is two lists. But one could also argue (as does the Secretary) that this is a single list displayed in two different ways. Contrary to the Association's argument, the best reading of section 2718(e), in its entirety, permits the Secretary to require hospitals to display the information in multiple ways.

## III.

In support of its APA claim, the Association argues that the Secretary failed to adequately address the difficulties that hospitals face in compiling the information the rule requires, overestimated the rule's benefits, and changed the interpretation of "standard charges" without adequate explanation. In considering these arguments, we are "not to substitute [our] judgment for that of the agency, but instead to assess only whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *DHS v. Regents of the University of California*, 140 S. Ct. 1891, 1905 (2020) (internal quotation marks and citation omitted). Moreover, and of special significance to this case, "when an agency's decision is primarily predictive, our role is limited; we require only that the agency acknowledge factual uncertainties and identify the considerations it found persuasive." *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009).

### *Feasibility and Administrative Burdens*

The Association advances two slightly different arguments under the umbrella of excessive burden. First, many negotiated rates are "unknown"—or even "unknowable," as Association counsel insisted at oral argument—so complying with the rule is "impracticable, and often impossible." Appellants' Reply Br. 24; Oral Arg. Rec. 8:36–9:10. Second, identifying each patient group's negotiated rate for all items and services would require a "herculean effort." Appellants' Br. 54. Central to both arguments, hospitals often build algorithms based on complex contracts to calculate the applicable negotiated rate for a particular patient's care. *Id.* at 53. Accordingly, the Association argues, many negotiated rates are determined only after the patient receives care and so cannot be disclosed beforehand. Relatedly, the Association argues that hospitals' complex

pricing systems produce an "unlimited number" of "standard charges," because possible permutations for identifiable patient groups are "infinite." *Id.* at 27, 30.

The Association's arguments miss the mark. Consider two examples, one raised at oral argument and one offered by the Association in its brief. Patient A may have thought she needed only one x-ray, but she actually needed two; and instead of paying twice the amount of the first x-ray, the insurer paid only 1.5 times that amount based on a volume discount. Patient B scheduled a hand nerve-repair surgery but ended up receiving tendon repair as well to correct a problem discovered during surgery; the insurer paid a discounted rate for the tendon repair because it occurred at the time of a related procedure. Whether and how much Patient A would be charged for the second x-ray and Patient B for the tendon repair was, as the Association emphasizes, "unknown" until after their treatments. The rule, however, does not require hospitals to disclose all possible permutations of costs based on hypothetical additional care or any other variable factor. It simply requires disclosure of *base* rates for an item or service, not the adjusted or final payment that the hospital ultimately receives based on additional payment methodologies. *See Price Transparency Requirements*, 84 Fed. Reg. at 65,550–51. So for Patient A, the rule requires disclosure of only the cost of one x-ray, and for Patient B, only the cost of a tendon repair procedure without any related procedures. Nothing in the rule requires the disclosure of discounts that may be applicable based on variable factors.

The same principle applies to rates for diagnosis-related groups. Responding to comments, echoed here by the Association, that payer-specific charges cannot be identified for diagnosis-related groups because rates can change based on the patient's condition or treatment plan, the rule makes clear

that the disclosure requirement applies to "the base rate that is negotiated by the hospital with the third party payer, and not the adjusted or final payment received by the hospital for a packaged service." *Id.* at 65,547.

This distinction between negotiated rates and final payments also addresses the Association's contention that the rule fails to grapple with situations where no negotiated rate exists for a certain line item because "multiple items and services [are folded] into bundled rates for a particular procedure." Appellants' Reply Br. 25. In response to comments raising just this concern, the rule explains that hospitals must disclose only base rates that have been negotiated. *Price Transparency Requirements*, 84 Fed. Reg. at 65,551. In other words, nothing in the rule requires hospitals to "reverse-engineer" what negotiated rate they may have hypothetically reached in lieu of a bundled rate. Appellants' Br. 54.

The same complex hospital billing systems and contracts drive the Association's argument that the rule will saddle hospitals with "inordinately costly" burdens. *Id.* at 25. According to the Association, hospitals can have "thousands of agreements" with individualized subcontracts for each plan, with each contract featuring "dozens of pages of complex conditions and formulae." *Id.* at 53. The rule, the Association complains, will require hospitals to "manually cull their contracts to identify each variable (location, inpatient versus outpatient setting, plan, etc.) and run each permutation," resulting in thousands of different patient groups. Appellants' Reply Br. 26, 30. As a result, hospitals expect to spend much more time and resources—"orders of magnitude" more—to comply with the rule than the Secretary's estimates. Appellants' Br. 57.

In considering this argument, our job is to determine whether the Secretary "examine[d] the relevant data and articulate[d] a satisfactory explanation for [his] action." *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983). The Secretary did just that.

As the Association concedes, the rule acknowledges that hospitals use different payment methodologies and house information across different systems, making it challenging to consolidate the data into one comprehensive list. Appellants' Reply Br. 27; *Price Transparency Requirements*, 84 Fed. Reg. at 65,556. The rule also recognizes that due to the number of payers per hospital, hospitals may have many payer-specific charges to compile, and that they utilize "a variety of payment methodologies in their contracts" with insurers. *Id.* at 65,593. In response to commenters' concerns, the rule clarifies that hospitals must disclose only base rates, delays the effective date by a year, and increases its burden estimate tenfold. *Id.* at 65,550–51, 65,575–76, 65,592–93. The rule thus recognizes that hospitals are at "different stages of readiness to offer consumers transparent price information" and that "different hospitals may face different constraints when estimating their burden and resources required." *Id.* at 65,593. Indeed, the resulting burden estimate for the implementation year—150 hours per hospital location—is similar to the estimate provided by the Healthcare Financial Management Association (HFMA), which filed an amicus brief in support of the Association. To be sure, as the Association points out, the rule's ultimate estimate is less than HFMA's because, unlike that estimate, it declines after the first year and includes clinician time. In our view, however, the Secretary reasonably adjusted the estimate downward for subsequent years based on a perfectly sensible assumption that compliance costs will decline once hospitals start using "the business processes and

system infrastructures or software . . . built or purchased during the first year." *Id.* at 65,596. That the Secretary arrived at an estimate thirty hours lower than an industry association's calculation was hardly unreasonable given the wide range of estimates offered by commenters. *Id.* at 65,593–94, 65,595–96; *see National Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012) ("[W]e do not review [the agency's] cost figuring de novo, but accord [the agency] discretion to arrive at a cost figure within a broad zone of reasonable estimate." (internal quotation marks omitted)). As the district court aptly put it, "[i]t can hardly be said hospitals' concerns about their burden fell on deaf ears." *American Hospital Ass'n*, 468 F. Supp. 3d at 389.

### *Benefits*

The Association challenges the Secretary's prediction that the disclosure scheme will advance the goal of "providing consumers with factual price information to facilitate more informed health care decisions." *Price Transparency Requirements*, 84 Fed. Reg. at 65,544–45. Instead, the Association claims, the rule is likely to "misinform[] consumers" and "facilitate anticompetitive effects." Appellants' Br. 59, 62. But again, the Secretary "examine[d] the relevant data and articulate[d] a . . . 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

As to efficacy, the rule points out that even though disclosure of negotiated rates alone will be insufficient to provide out-of-pocket cost estimates for many insured consumers, such rates are "a critical piece of information necessary for patients to determine their potential out-of-pocket cost estimates in advance of a service." *Price Transparency Requirements*, 84 Fed. Reg. at 65,543. It then

explains that the disclosure scheme will provide out-of-pocket cost estimates for consumers without insurance and will be "highly beneficial for consumers in [high-deductible insurance plans] and in plans where the consumer is responsible for a percentage (that is, co-insurance) of the negotiated rate." *Id.* at 65,547. For example, a consumer who knows that her copay is twenty percent can estimate her out-of-pocket cost as twenty percent of the rate negotiated by the insurer. *See id.* The rule compares this outcome to the status quo, i.e., only chargemaster rates are publicly available and they apply to fewer than ten percent of patients, and concludes that the enhanced disclosure scheme will help more consumers. The rule also predicts that its disclosure scheme will enable researchers, government officials, clinicians, employers, and other third parties to "bring more value to healthcare." *Id.* at 65,555–56, 65,599.

As to consumer confusion, the rule recognizes such a possibility but nonetheless concludes that the disclosure scheme will benefit the "vast majority" of consumers, especially because consumers are already "exceptionally frustrated at the lack of publicly available data," and because the availability of the data will lead to more price transparency tools developed by third parties. *Id.* at 65,547. The Association criticizes the rule's reliance on third-party actors, calling it "irrationally convoluted." Appellants' Br. 60. But anticipating that third-party price aggregators and researchers will bring more efficiency to an industry as large and important as healthcare hardly strikes us as irrational. Indeed, such services are ubiquitous in other industries where prices are publicly available, such as travel booking websites and used car price aggregators.

Finally, the rule acknowledges commenters' concerns about potential anticompetitive effects but concludes that,

based on available research in the healthcare industry and traditional economic analysis, the disclosure scheme is likely to lead to lower, not higher, prices. *Price Transparency Requirements*, 84 Fed. Reg. at 65,529, 65,538–39, 65,598–99. The Association complains that the rule's analysis rests on inapposite data that came from state-led initiatives that either failed to disclose precisely the same information or collected the information from different sources. The Secretary, however, is not limited to relying only on definitive evidence: "even if this dataset was less than perfect, imperfection alone does not amount to arbitrary decision-making." *District Hospital Partners, L.P. v. Burwell*, 786 F.3d 46, 61 (D.C. Cir. 2015); *see also State Farm*, 463 U.S. at 52 ("It is not infrequent that the available data does not settle a regulatory issue and the agency must then exercise its judgment in moving from the facts and probabilities on the record to a policy conclusion."). Given the newness of this disclosure scheme, the Secretary reasonably relied on studies of similar price transparency schemes to inform his policy judgment.

The rule's chief purpose, as the Secretary emphasizes, is to "shift to hospitals some of the burden that patients currently bear" in "navigating a non-transparent hospital-care system." Appellee's Br. 48; *Price Transparency Requirements*, 84 Fed. Reg. at 65,547. The Secretary weighed the rule's costs and benefits and made a reasonable judgment that the benefits of easing the burden for consumers justified the added burdens imposed on hospitals. *See Ad Hoc Telecommunications Users Committee v. FCC*, 572 F.3d 903, 908 (D.C. Cir. 2009) (explaining that agency decisions implicating "competing policy choices . . . and predictive market judgments" warrant particular deference).

### *Change in Position*

The Association accuses the Secretary of "not adequately acknowledg[ing] [the agency's] about-face from its prior policy position." Appellants' Br. 63. As the Supreme Court has explained, an agency may change its policy position but must "display awareness that it *is* changing position" and "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Here, the Secretary did both. The rule expressly acknowledges the prior policy—that hospitals could comply with section 2718(e) by publishing chargemaster rates—and explains that disclosing only those rates was "[in]sufficient to inform consumers . . . what their charges for a hospital item or service will be." *Price Transparency Requirements*, 84 Fed. Reg. at 65,525, 65,537. The rule then gives "good reasons" for requiring more, namely, that the disclosure scheme will fill the "information gap" in "easily accessible pricing information for consumers." *Id.* at 65,527.

The Association's passing mention of reliance interests falls short. True, "the APA requires an agency to provide more substantial justification . . . when [the agency's] prior policy has engendered serious reliance interests that must be taken into account." *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 106 (2015) (internal quotation marks omitted). But the Association has identified no reliance interests the rule might be upending. Moreover, nothing in the rule renders hospitals' prior investments in individual counseling or online price transparency tools obsolete. Indeed, hospitals that have already developed online price transparency tools are exempted from the shoppable services list requirement. *See Price Transparency Requirements*, 84 Fed. Reg. at 65,578.

**IV.**

The Association's argument that the rule violates the First Amendment is squarely barred by the Supreme Court's decision in *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626 (1985), and our case law applying that decision. In *Zauderer*, the Court rejected a First Amendment challenge to a state disciplinary ruling that required an attorney to disclose that clients may be liable for significant legal costs even if not liable for legal fees. Critical to the Court's decision, the disciplinary ruling required disclosure of only "purely factual and uncontroversial information about the terms under which [the attorney's] services will be available," and the attorney's countervailing interest "in *not* providing any particular factual information" was "minimal." *Zauderer*, 471 U.S. at 650–51. The First Amendment, the Court held, permits such disclosure schemes "as long as [they] are reasonably related to the State's interest in preventing deception of consumers" and "are not unduly burdensome . . . by chilling protected commercial speech." *Id.* at 651–52.

As in *Zauderer*, the information the rule requires hospitals to disclose—rates negotiated with insurers and formalized in their contracts—is "factual and uncontroversial" and directly relevant to "the terms under which [hospitals'] services will be available" to consumers. *Id.* at 650–51. Also as in *Zauderer*, the rule requires disclosure of "more information than [hospitals] might otherwise be inclined to present," rather than imposing an "outright prohibition[] on speech." *Id.*; *see also Spirit Airlines, Inc. v. DOT*, 687 F.3d 403, 414 (D.C. Cir. 2012) (sustaining under *Zauderer* a Department of Transportation rule requiring airlines to prominently display final prices on their website because "the rule is aimed at providing accurate information, not restricting it").

The Association does not dispute that the government has a legitimate interest in promoting price transparency and lowering healthcare costs. Instead, it contends that the rule bears no reasonable relationship to those governmental interests because the required disclosures "may not be immediately or directly useful for many health care consumers." Appellants' Br. 47–48 (internal quotation marks omitted). But as explained in our discussion of the Association's APA claim, the Secretary, relying on complaints from consumers, studies of state initiatives, and analysis of industry practices, reasonably concluded that the rule's disclosure scheme will help the vast majority of consumers. *See supra* at 17–18. Moreover, *Zauderer*'s "reasonably related" analysis need not involve "evidentiary parsing" where, as here, "the government uses a disclosure mandate to achieve a goal of informing consumers about a particular product trait." *American Meat Institute v. USDA*, 760 F.3d 18, 26 (D.C. Cir. 2014) (en banc). Even in cases that employ more searching standards of review, courts have accepted "reference to studies and anecdotes," as well as justifications "based solely on history, consensus, and simple common sense." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (internal quotation marks omitted).

The Association argues that the rule fails *Zauderer*'s reasonably related test for another reason, namely, that it will "mislead consumers." Appellants' Br. 48. But again, the Secretary found to the contrary—that the rule is unlikely to "cause confusion beyond the confusion and frustration that currently exists." *Price Transparency Requirements*, 84 Fed. Reg. at 65,547. Indeed, it is the current rule (preferred by the Association) that is misleading, as it requires disclosure of only chargemaster rates, even though they apply to fewer than ten percent of consumers.

Invoking *Zauderer*'s final requirement that the challenged rule not be "'unduly burdensome' in a way that 'chill[s] protected commercial speech,'" the Association argues, as it did in its APA challenge, that the rule will impose excessive financial burdens on hospitals. *American Meat Institute*, 760 F.3d at 26 (alteration in original) (quoting *Zauderer*, 471 U.S. at 651). To prevail in a First Amendment challenge, however, the Association must demonstrate a burden on *speech*, and it has pointed to no such burden. The rule neither requires hospitals to endorse a particular viewpoint nor prevents them from adding their own message on the same website or even in the same file.

The Association's remaining arguments are equally without merit.

The *Zauderer* standard, the Association insists, is limited to restrictions on advertising and point-of-sale labeling. But our court has not so limited the standard, applying it, for example, to court-mandated disclosures on websites. *See United States v. Philip Morris*, 855 F.3d 321 (D.C. Cir. 2017) (applying *Zauderer* to corrective statements that the district court ordered the corporation to display on its website for a RICO violation). And in *National Ass'n of Manufacturers v. SEC*, 800 F.3d 518 (D.C. Cir. 2015), relied on by the Association, our court declined to apply *Zauderer* because the rule at issue required corporations to "express certain views" that their products containing conflict minerals were "ethically tainted." *Id.* at 523, 530. No such expressive content is at issue here.

The Association contends that the Secretary failed to consider "many less-speech restrictive alternatives." Appellants' Br. 25. *Zauderer*, however, imposes no such obligation. And even were we required to apply intermediate scrutiny, which does impose a "no broader than necessary"

requirement, the Secretary would not have to demonstrate a "perfect means-ends fit," or "satisfy a court that [he] has chosen the best conceivable option"—just that the fit is "reasonable." *National Cable & Telecommunications Ass'n v. FCC*, 555 F.3d 996, 1002 (D.C. Cir. 2009); *Board of Trustees of State University of New York v. Fox*, 492 U.S. 469, 479–80 (1989). Here, the Secretary carefully considered the alternatives suggested by commenters, and the record supports his decision to require more fulsome disclosure for all items and services. *Price Transparency Requirements*, 84 Fed. Reg. at 65,446, 65,560–62, 65,601; *see also National Cable & Telecommunications Ass'n*, 555 F.3d at 1002 (finding that the agency complied with the "no broader than necessary" prong under intermediate scrutiny because it "carefully considered the differences between [] two regulatory approaches, and the evidence supports the [agency]'s decision").

Finally, the Association argues that we should subject the rule to strict scrutiny. In support, it relies on *Barr v. American Ass'n of Political Consultants* (*AAPC*), 140 S. Ct. 2335 (2020), in which the Court sustained a First Amendment challenge to a statute barring political speakers from making robocalls while allowing the government to use them for debt collection. But unlike the rule at issue here, that law was "directed at certain content," "aimed at particular speakers," and restricted political speech. *Id.* at 2347 (internal quotation marks omitted). Significantly for our purposes, moreover, the *AAPC* plurality made clear that the decision not only "fits comfortably within existing First Amendment precedent," but also is "not intended to expand existing First Amendment doctrine or to otherwise affect traditional or ordinary economic regulation of commercial activity." *Id.* Requiring hospitals to disclose prices before rendering services undoubtedly qualifies as "traditional or ordinary economic regulation of commercial activity." *Id.*

25

## V.

For the foregoing reasons, we affirm the district court's grant of summary judgment to the Secretary.

*So ordered.*