Filed 10/13/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| GORDON GRAY,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>DIGNITY HEALTH,<br><br>    Defendant and Respondent. | A158648<br><br>(San Francisco City &<br>County Super. Ct.<br>No. CGC-19-574074) |

**INTRODUCTION**

After plaintiff Gordan Gray received emergency medical care at St. Mary Medical Center (owned and operated by defendant Dignity Health), he received a bill that included an " 'ER LEVEL 2 W/PROCEDU' " charge (ER Charge). Gray maintains Dignity's failure to disclose, prior to providing emergency medical treatment, that its bill for emergency services would include such a charge—either by posting "signage in and around" the emergency department or "verbally during the patients' registration process" —is an unfair business practice under the Unfair Competition Law (UCL) and unlawful under the Consumers Legal Remedies Act (CLRA). He seeks declaratory and injunctive relief requiring specific disclosure of this particular charge to all persons presenting at any Dignity-operated emergency department "in advance of providing treatment that would trigger" an ER Charge.

1

It is important to point out what Gray does not claim. He does not claim that by including an ER Charge in its billing, Dignity is in violation of any of the extensive state and federal statutory and regulatory law governing the disclosure of hospital billing information and the treatment of persons presenting for treatment at an emergency department. Nor does he take issue with the hospital's "chargemaster" amount for the Level 2 ER Charge (and which his medical insurance largely covered). Rather, his UCL, CLRA, and declaratory relief claims are based solely on his assertion Dignity must, prior to providing emergency medical care, disclose that this specific charge will be included in its billing.

The trial court sustained Dignity's demurrer to Gray's complaint without leave to amend and entered a judgment of dismissal. We affirm.

## BACKGROUND

### *Statutory and Regulatory Background*

The Legislature has enacted a series of statutes, collectively known as the "Payers' Bill of Rights," setting forth numerous obligations California hospitals owe to consumers with respect to the pricing of medical services. (Health & Saf. Code, § 1339.50 et seq.[1]) In enacting this legislation, and amending it in 2005, the Legislature sought to increase the transparency in hospital pricing to enable consumers to comparison shop for medical services. (See Cal. Health & Human Services Agency, Enrolled Bill Rep. on Assem. Bill No. 1045 (2005-2006 Reg. Sess.) ["intent of this bill is to provide healthcare purchasers with more information about the prices charged by hospitals for

---

[1] All further statutory references are to the Health and Safety Code unless otherwise indicated.

2

common inpatient and outpatient procedures to allow purchasers to make more informed decisions when seeking hospital care].[2])

This statutory scheme requires California hospitals (except "small and rural hospitals," an exception that does not apply here), to make a written or electronic copy of the hospital's "chargemaster" available to the public. (§ 1339.51, subd. (a)(1)-(2).)  The chargemaster lists the uniform charge for given services represented by the hospital as its gross billed charge for a given service or item, regardless of payer type, and sets forth every hospital charge for every type of service, including emergency room services.  (*Id.*, subd. (b)(1).)  The chargemaster must be available on the hospital's Web site or at the hospital itself.  (*Id.*, subd. (a)(1).)  In addition, the hospital must post clear and conspicuous notices in its emergency room and its admissions and billing offices informing patients that the chargemaster is available for review and how it may be accessed.  (*Id.*, subd. (c).)

Hospitals must submit their chargemasters to the Office of Statewide Health Planning and Development (OSHPD) on an annual basis (§ 1339.55, subd. (a)), and chargemasters are available to the public on OSHPD's Web site.  (*Id.*, subd. (b).)  The OSHPD is empowered to require that chargemasters be filed "in a format determined by the office," (*id.*, subd. (a)) but has not issued any formatting requirements.[3]  (See

---

[2]  We grant Dignity's request for judicial notice of documents the trial court judicially noticed and the legislative history of the Payers' Bill of Rights.  (Evid. Code, §§ 452, subds. (b)–(c) & 459, subd. (a).)

[3]  Opponents of the legislation claimed requiring the disclosure of chargemasters would not accomplish the objective of assisting consumers in making meaningful price comparisons because chargemasters are sizeable compilations and assertedly meaningful only to medical record coders.  (Sen. Health & Human Services Comm., Analysis of Assem. Bill No 1627 (2003-2004 Reg. Sess.) as amended July 3, 2003, p. 3; see generally *American Hosp. Association v. Azar* (D.C. Cir. 2020) 983 F.3d 528, 531-533 (*AHA*) [discussing

3

https://oshpd.ca.gov/data-and-reports/cost-transparency/hospital-chargemasters/ [as of Oct. 13, 2021] [stating "chargemasters are currently not required to be provided in a standardized format"].)

Hospitals must separately submit to the OSHPD, on an annual basis, a list of their 25 most common outpatient procedures and charges. (§ 1339.56, subd. (a).) These can include, as is the case with St. Mary, ER Charges. A hospital must provide a copy of its list "to any person upon request." (*Id.*, subd. (c).) OSHPD also makes these lists available on its Web site. (*Id.*, subd. (a).[4])

In addition to the chargemaster and list of common outpatient charges disclosure requirements, the state statutory scheme imposes a specific disclosure requirement with respect to persons "without health coverage," stating in pertinent part:

> "Upon the request of a person without health coverage, a hospital shall provide the person with a written estimate of the amount the hospital will require the person to pay for the health care services, procedures, and supplies that are reasonably expected to be provided to the person by the hospital, based upon an average length of stay and services provided for the person's diagnosis. . . . This section shall not apply to emergency services provided to a person under Section 1317." (§ 1339.585.)

As originally introduced, this legislation required hospitals to provide an estimate of charges upon the request of any patient—including those receiving care in the emergency department. (Assem. Bill No. 1045 (2005-2006 Reg. Sess.) as introduced Feb. 22, 2005.) As the bill moved through the

---

chargemasters and upholding new federal regulations requiring disclosure of additional pricing information].)

[4] <https://data.chhs.ca.gov/dataset/chargemasters> [as of Oct. 13, 2021].

legislative process, it was amended first to apply only to non-emergency patients (Assem. Bill No. 1045 (2005-2006 Reg. Sess.) as amended May 27, 2005) and then amended again to apply only to uninsured persons. (Assem. Bill No. 1045 (2005-2006 Reg. Sess.) as amended Sept. 6, 2005.)

Section 1317, in turn, imposes obligations on California hospitals specifically with respect to emergency medical services. It requires hospitals to provide such services to any person presenting at the emergency department "for any condition in which the person is in danger of loss of life, or serious injury or illness," and to do so regardless of the ability to pay.[5] (§ 1317, subds. (a) & (b).) Indeed, it mandates that "[e]mergency services and care shall be rendered without first questioning the patient or any other person as to his or her ability to pay therefor." (*Id.*, subd. (d).) "After" emergency care is provided "the patient or his or her legally responsible relative or guardian shall execute an agreement to pay therefore or otherwise supply insurance or credit information. . . ." (*Ibid.*)

Finally, the Hospital Fair Pricing Act requires California hospitals to establish, give notice of, and administer financial aid and charity care policies. (§ 127405, subd. (a)(1)(A).)

Federal law imposes like obligations on Medicare participating hospitals, as is St. Mary. "[I]f any individual . . . comes to the [hospital's] emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide

---

[5] " 'Emergency services and care' " is defined to mean "medical screening, examination, and evaluation by a physician and surgeon . . . to determine if an emergency medical condition or active labor exists and, if it does, the care, treatment and surgery, if within the scope of that person's license, necessary to relieve or eliminate the emergency medical condition, within the capability of the facility." (§ 1371.1, subd. (a)(1).)

5

for an appropriate medical screening examination within the capability of the hospital's emergency department. . . ."  (42 U.S.C. § 1395dd(a).)  Federal law also instructs that "[a] [Medicare] participating hospital may not delay provision of an appropriate medical screening examination required under subsection (a) or further medical examination and treatment required under subsection (b) in order to inquire about the individual's method of payment or insurance status." (42 U.S.C. § 1395dd(h); see 42 C.F.R. § 489.24(d)(4)(ii) (2021) ["A [Medicare] participating hospital may not seek, or direct an individual to seek, authorization from the individual's insurance company for screening or stabilization services to be furnished by a hospital . . . to an individual until after the hospital has provided the appropriate medical screening required under paragraph (a) of this section, and initiated any further medical examination and treatment that may be required to stabilize the emergency medical condition. . . ."].)

Federal law also prohibits tax-exempt hospitals, such as St. Mary, from doing anything that might "discourage" emergency room patients from following through with needed emergency treatment.  Hospital policy must prohibit "the hospital facility from engaging in actions that discourage individuals from seeking emergency medical care, such as by demanding that emergency department patients pay before receiving treatment for emergency medical conditions. . . ."  (26 C.F.R. § 1.501(r)-4(c)(2) (2021); see 42 C.F.R. § 489.24(d)(4)(iv) (2021) [hospital emergency department registration procedures "may not unduly discourage individuals from remaining for further evaluation"].)

Effective January 2, 2021, federal regulatory law, pursuant to the Affordable Care Act, imposes additional pricing disclosure requirements on Medicare participating hospitals—namely that they must file, in addition to

their chargemaster, a "list" of "standard charges" in accordance with guidelines promulgated by the Secretary of Health and Human Services.[6] (42 U.S.C. § 300gg-18(e).) "The Secretary proposed requiring hospitals to disclose not just chargemaster rates, but also 'payer-specific negotiated charges' for their items, and to disclose them in two different ways: a single digital file containing charges for all items and services, and a 'consumer-friendly' list of charges for three hundred 'shoppable' services, defined as services that can be scheduled in advance [citation], 'like a colonoscopy.' " (*AHA, supra,* 983 F.3d at p. 532.) "The Secretary was concerned that chargemaster rates, though previously treated as adequate for complying with [federal law], in fact failed to sufficiently inform patients of their costs. This is because . . . patients rarely pay chargemaster rates." (*Id.* at p. 232; see *Kendall v. Scripps Health* (2017) 16 Cal.App.5th 553, 568-573 (*Kendall*), disapproved on another ground in *Noel v. Thrifty Payless Inc.* (2019) 7 Cal.5th 955, 986, fn. 15 [discussing complexity of and circumstance-specificity of hospital billings].)

"After receiving nearly four thousand comments, the Secretary issued a final rule that defines 'standard charge' as 'the regular rate established by the hospital for an item or service provided to a specific group of paying patients." (*AHA, supra,* 983 F.3d at p. 532; 45 C.F.R. §§ 180.20, 180.40 (2021).) Accordingly, hospitals must now "post standard charges for at least 300 shoppable services that can be planned in advance. . . ." (https://www.cms.gov/hospital-price-transparency/consumers [as of Aug. 8, 2021].) Shoppable services "are typically those that are routinely provided in non-urgent situations that do not require immediate action or attention to

---

[6] The parties submitted supplemental letter briefs on the import of this new regulatory mandate.

the patient, thus allowing patients to price shop and schedule a service at a time that is convenient for them." (84 Fed. Reg. 65564.) Thus, the list of 300 such services includes 70 specific services identified by the Center for Medicare and Medicaid Services (CMS) following efforts "to ensure such services could be scheduled in advance." (84 Fed. Reg. 65571.)

The new required information is made public for purposes of the rule when it is available on "an appropriate publicly available internet location" selected by the hospital; it is "displayed [on the internet] in a prominent manner that identifies the hospital location with which the information is associated"; and the information is "easily accessible, without barriers," meaning the information is free of charge, accessible without registration or creation of a user account or password, or without submission of any personal identifying information, and searchable in specified respects. (45 C.F.R. §180.60, subd. (d)(1)–(3)(i)–(iv) (2021); see 45 C.F.R. § 180.50, subd. (d) (2021); see also 84 Fed. Reg. 65553, 65556; *Id*., at 65560 [CMS comment that "the common data requirements we are finalizing provide sufficient information for consumers to compare hospital standard charges"].)[7]

During the rule making process, concern was raised "that if the hospital attempts to provide pricing information to patients prior to stabilizing them, it would not only constitute an EMTALA [Emergency Medical Treatment and Active Labor Act] violation, but it could also potentially cause the patient's health to deteriorate since it would delay the

---

[7] The CMS observed hospitals are free to choose to provide additional information, "applaud[ing] hospitals that take the additional step to provide this information to consumers on an individual basis through financial counseling in addition to meeting the posting requirements for the public files." (84 Fed. Reg. 65577.)

8

patient receiving critical care."[8]  (84 Fed. Reg. 65536.)  In response, the CMA explained why the new regulatory requirements would not conflict with that Act:

> "[W]e believe that the policies we finalize here that require hospitals to make public standard charges *online* are distinct from EMTALA's requirements and prohibitions and that the two bodies of law are not inconsistent and can harmoniously co-exist.  To be clear, the price transparency provisions that we are finalizing do *not require that hospitals post any signage or make any statement at the emergency department regarding the cost of emergency care or any hospital policies regarding prepayment of fees or payment of co-pays and deductibles.*"  (84 Fed. Reg. 65536, italics added.)

### *Plaintiff's Lawsuit*

Gray does not allege that Dignity violated any of the statutory and regulatory duties set forth above.  Rather, he claims the hospital is required to do more than is required by the federal and state regulatory schemes, and specifically, is required to disclose to emergency department patients, prior to providing any treatment, that its billing will include an ER Charge  (which in the case of St. Mary, is a charge set forth in both its chargemaster and its

---

[8]  "Under EMTALA, hospitals with emergency departments have two obligations.  First, if any individual comes to the emergency department requesting examination or treatment, a hospital must provide for 'an appropriate medical screening examination within the capability of the hospital's emergency department.'  (42 U.S.C. § 1395dd(a).)  Second, if the hospital 'determines that the individual has an emergency medical condition,' it must provide 'within the staff and facilities available at the hospital' for 'such treatment as may be required to stabilize the medical condition' and may not transfer such a patient until the condition is stabilized or other statutory criteria are fulfilled.  (*Id.,* § 1395dd(b) & (c)."  (*Barris v. County of Los Angeles* (1999) 20 Cal.4th 101, 109.)

9

separate list of the 25 most common outpatient charges filed with the OSHPD).

Gray alleges that he sought and received treatment at St. Mary's emergency department in August 2018. After he received treatment, he signed the hospital's conditions of admission (COA) form.

Gray was insured through Kaiser at the time. As to insured patients, the COA stated in pertinent part:

> "We will bill the patient's insurance company for all the services provided during this stay. Co-payments, co-insurance and deductibles required by the insurance company must be paid by the Patient. . . . If the insurance company or benefit plan denies all or part of the payment, the Patient agrees to be responsible to pay any amounts due to the Hospital under the law. . . . [¶] . . . [¶] You also agree the Patient is financially responsible as allowed by law for any charges not paid by the insurer or benefit plan."

Gray alleges he was sent a bill showing a "gross" hospital charge of $4,112.04, of which $1,552.00 was an "ER LEVEL 2 W/PROCEDU" charge, which he characterizes as a "surcharge." The ER Charge for Gray's treatment had a CPT (current procedural terminology) Code of 99282, which refers to an "Emergency department visit for the evaluation and management of a patient, which requires these 3 key components: An expanded problem focused history; An expanded focused examination; and Medical decision making of low complexity. . . . Usually, the presenting problem(s) are of low to moderate severity." (<https://www.medicalbillingcptmodifiers.com/2013/01/emergency-department-cpt-codes-99281.html> [as of Oct. 13, 2021].) There are five "levels" of such ER Charges.[9]

---

[9] While in his complaint, Gray pejoratively calls an ER Charge a "surcharge" that "is not based on the individual items of treatment or services

10

Gray does not allege how much he ultimately owed the hospital, after insurance adjustments and payments by his insurer. But the billings sent to him state he ultimately owed the hospital $879.19.

Gray complains the COA made "no mention" that Dignity would bill for an ER Charge "in addition to the charges for the specified services provided" and that this charge "is not disclosed on signage posted in or around Defendant's emergency rooms, or verbally during the patients' registration process." Gray further asserts the ER Charge "is not based on the individual terms of treatment or services provided to the patient," but is "charged to emergency room patients simply for presenting and being seen" in the emergency department. He maintains the "failure to disclose" the ER Charge "is particularly egregious in light of the fact that Defendant represents itself as a charitable, non-profit organization, providing care and help to patients in the community."

Gray also brings the case as a putative class action on behalf of "[a]ll individuals who, within the last four years, received treatment at a Dignity Health emergency room in California, and who were charged an emergency room fee . . . which is billed on top of the charges for the individual items of treatment and services provided."

Gray alleges three causes of action: for unfair competition under the UCL, for violation of the CLRA, and for declaratory/injunctive relief. Gray's attorney acknowledged that each of his causes of action was grounded solely on Dignity's failure to separately and specifically disclose its ER Charge prior to providing emergency medical care—"on signage posted in or around" the

_____

provided," in his closing brief on appeal, wherein he proposes language of the signage he claims is required, he describes the charge as "intended to cover the costs of [the patient's] initial evaluation and management" and "costs of operating and maintaining [a] 24-hour Emergency Department."

11

emergency department, or "verbally during the patients' registration process."  Gray claims this one specific charge must be disclosed prior to the rendition of any emergency medical care, because "if known about prior to treatment," the charge "would be a substantial factor in a patient's decision to remain at the Hospital and proceed with treatment."

Dignity interposed a demurrer, which the trial court sustained without leave to amend, relying largely on *Nolte v. Cedars-Sinai Medical Center* (2015) 236 Cal.App.4th 1401, 1408 (*Nolte*), which affirmed the dismissal of a UCL case based on allegations Cedars-Sinai had not "specifically, separately, and individually disclose[d]" an administrative charge prior to the plaintiff receiving services from a physician at a hospital medical facility.  (Italics omitted.)

## DISCUSSION[10]

*The UCL Claim*

" 'The purpose of the UCL [citation] "is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services.  [Citation.]" ' (*McKell v. Washington Mutual, Inc.* (2006)

---

[10]  "We review the trial court's sustaining of the general demurrer independently, and '[o]ur task in reviewing a judgment of dismissal following the sustaining of a demurrer is to determine whether the complaint states a cause of action.'  [Citation.]  We treat the demurrer as admitting all the properly pleaded material facts and consider matters which may be judicially noticed, but we do not treat as admitted contentions, deductions, or conclusions of fact or law.  [Citation.]  Further, ' "we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context." ' [Citation.]  Because a demurrer tests only the legal sufficiency of the pleading, we accept as true even the most improbable alleged facts, and we do not concern ourselves with the plaintiff's ability to prove its factual allegations.  [Citation.]  'Facts appearing in exhibits attached to the first amended complaint also are accepted as true and are given precedence, to the extent they contradict the allegations.' " (*Nolte, supra,* 236 Cal.App.4th at pp. 1405–1406.)

12

142 Cal.App.4th 1457, 1470. . . .) 'A UCL action is equitable in nature; damages cannot be recovered. [Citation.] . . . [U]nder the UCL, "[p]revailing plaintiffs are generally limited to injunctive relief and restitution." ' (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1144. . . .)" (*Durell v. Sharp Healthcare* (2010) 183 Cal.App.4th 1350, 1359 (*Durell*).)

"The UCL does not proscribe specific acts, but broadly prohibits 'any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising. . . .' (Bus. & Prof. Code, § 17200.) 'The scope of the UCL is quite broad. [Citations.] Because the statute is framed in the disjunctive, a business practice need only meet one of the three criteria to be considered unfair competition.' (*McKell v. Washington Mutual, Inc., supra,* 142 Cal.App.4th at p. 1471.) ' "Therefore, an act or practice is 'unfair competition' under the UCL if it is forbidden by law or, even if not specifically prohibited by law, is deemed an unfair act or practice." ' (*Troyk v. Farmers Group, Inc.* (2009) 171 Cal.App.4th 1305, 1335. . . .)"[11] (*Durell, supra,* 183 Cal.App.4th at p. 1359.)

"Historically, the UCL authorized any person acting for the interests of the general public to sue for relief notwithstanding any lack of injury or damages. (*Troyk v. Farmers Group, Inc., supra,* 171 Cal.App.4th at p. 1335.) At the November 2, 2004, General Election, the voters approved Proposition 64, which amended the UCL to provide that a private person has standing to bring a UCL action only if he or she 'has suffered injury in fact and has lost money or property as a result of the unfair competition.' (Bus. & Prof. Code,

---

[11] "Although the likelihood of deception is often too fact intensive to decide on the pleadings, courts can and do sustain demurrers on UCL claims when the facts alleged fail as a matter of law to show such a likelihood." (*Rubenstein v. The Gap, Inc.* (2017) 14 Cal.App.5th 870, 877; see *Nolte, supra,* 236 Cal.App.4th at p. 1409.)

13

§ 17204; *Troyk v. Farmers Group, Inc., supra,* at p. 1335.) 'A private plaintiff must make a twofold showing: he or she must demonstrate injury in fact *and* a loss of money or property caused by unfair competition.' (*Peterson v. Cellco Partnership* (2008) 164 Cal.App.4th 1583, 1590. . . .)" (*Durell, supra,* 183 Cal.App.4th at p. 1359.) " 'The voters' intent in passing Proposition 64 and enacting the changes to the standing rules in Business and Professions Code section 17204 was unequivocally to narrow the category of persons who could sue businesses under the UCL.' " (*Durell,* at p. 1359, quoting *Hall v. Time Inc.* (2008) 158 Cal.App.4th 847, 853.)

Gray asserts two bases for his UCL claim. He generically alleges that Dignity's failure to disclose that it would include an ER Charge in its billing prior to providing emergency medical services was "unfair" because the COA did not "mention" the charge, there was no "signage in the emergency room" disclosing this charge, and there was no "verbal[]" disclosure to him "during registration."

He additionally alleges Dignity's failure to disclose, prior to providing emergency medical services, that its bill for such service would include an ER Charge is both an "unfair" and "unlawful" business practice because the hospital "bills patients amounts in violation of the [CLRA]" and therefore his UCL "claim is tethered to a legislatively declared policy." In connection with his CLRA claim, he alleges Dignity's failure to disclose, prior to providing emergency medical services, that the hospital's bill for such services would include an ER Charge (1) constituted a misrepresentation that the services and/or supplies in question had characteristics, uses and/or benefits they did not have in violation of Civil Code section 1770, subdivision (a)(5), and (2) constituted a representation that a transaction involved obligations which it

14

did not have or involve, or which were prohibited by law in violation of Civil Code section 1770, subdivision (a)(14).

We address first Gray's generic claim—that Dignity's failure to disclose, prior to providing emergency services, that its billing would include an ER Charge is an "unfair" business practice.

The UCL does not define the term "unfair." It is frequently stated that " '[a] business practice is unfair within the meaning of the UCL if it violates established public policy or if it is immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs its benefits. [Citations.] The determination whether a business practice is unfair " ' "involves an examination of [that practice's] impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer. In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim. . . . [Citations.]" [Citation.]' " ' (*McKell v. Washington Mutual, Inc.* (2006) 142 Cal.App.4th 1457, 1473. . . .)" (*Nolte, supra,* 236 Cal.App.4th at pp. 1407–1408.) Some courts have, in the wake of *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163 (*Cel Tech*), adopted a more rigorous standard, requiring that "unfairness" be "tethered to some legislatively declared policy." (See generally *Moran v. Prime Healthcare Management, Inc.* (2016) 3 Cal.App.5th 1131, 1150 (*Moran*) [discussing different standards applied by the Courts of Appeal]; *Durell, supra,* 183 Cal.App.4th at pp. 1364–1365 [same].)

We need not decide which standard is preferable, as even under the standard more generous to consumers, as was applied in *Nolte*, Gray does not state a claim for an "unfair" business practice. We agree with the trial court that *Nolte* is analogous to the instant case, and we agree with *Nolte's* holding.

15

The plaintiff in *Nolte* saw a physician who practiced in a Cedars-Sinai medical facility. (*Nolte, supra,* 236 Cal.App.4th at p. 1406.) "Like all the doctors in the Cedars network, Nolte's physician's practice had contracted with Cedars for Cedars to maintain computerized records for its patients." (*Ibid.*) At the physician's office, Nolte signed the Cedars-Sinai COA, which stated, among other things, that Nolte was admitted to the medical center as an outpatient, "that all physicians were independent contractors who 'may bill separately for their services,' " and that as a patient of the medical center, Nolte obligated himself to pay the " 'account of the Hospital in accordance with the regular rates and terms of the Hospital.' " (*Id.* at p. 1404.) Nolte received a bill from the physician, which he paid. (*Id.* at p. 1405.) He also received a bill from Cedars-Sinai for $167.01, to which the hospital applied a "discount," leaving a balance owing of $78.49. (*Ibid.*) The physician told Nolte this was a " 'facility' " fee, which Cedars-Sinai charged for creating patient accounts on its computer system. (*Ibid.*) Nolte complained he was not told about the hospital's fee when he met with the physician, nor did the hospital's COA alert him to the fee. (*Ibid.*) He asserted the previously undisclosed fee was an "unfair and fraudulent" business practice under the UCL. (*Id.* at p. 1407.) The trial court sustained the hospital's demurrer without leave to amend. (*Id.* at p. 1405.) The Court of Appeal affirmed. (*Id.* at p. 1410.)

The appellate court pointed out that Nolte did not allege that the Cedars-Sinai fee, itself, was unfair or excessive, but rather, that the hospital had not "specifically, separately, and individually" disclosed to him, prior to treatment, that it would charge such a fee. (*Nolte, supra,* 236 Cal.App.4th at p. 1408.) This, said the court, did not state a claim for an "unfair" business practice. (*Ibid.*)

16

"[H]ospitals are required by law to make available a schedule of charges online or at the hospital, and to provide notice to consumers (here, patients) that they have done so in a prescribed fashion, and there is no allegation that Cedars did not do so. Cedars's agreement with Nolte's physician was that it would set up the computerized billing service for the patients. Nolte signed the COA stating that he would pay Cedars's charges, and that he may be billed separately by his physician and by Cedars (which was prohibited by law from employing his physician). Cedars then issued a separate bill to Nolte for creating his patient account (a function which the complaint alleges is often provided by the medical providers themselves, who would then presumably pass on the administrative cost to the patient). Here, Nolte agreed in the COA to separate billing." (*Nolte, supra,* 236 Cal.App.4th at p. 1408.)

Nor did Nolte's complaint that the fee was not separately and individually disclosed prior to treatment state a claim for "fraudulent" business practices. "The test for fraud under Business and Professions Code section 17200 is ' " 'whether the public is likely to be deceived.' " ' " (*Nolte, supra,* 236 Cal.App.4th at p. 1409, quoting *Searle v. Wyndham Internat., Inc.* (2002) 102 Cal.App.4th 1327, 1335.) The complaint, however, did "not allege (and the law does not provide) that Nolte had the right to have every individual charge specifically disclosed to him in advance before Cedars issued a bill. Cedars's obligation to Nolte and other consumers of medical services was that Cedars make a written or electronic copy of its schedule of charges available in the manner codified in section 1339.51 of the Health and Safety Code, and there is no allegation that Cedars did not do so. Further, 'there is no requirement [under the UCL] that reasonable notice has to be the best possible notice.' " (*Nolte,* at p. 1409, quoting *Plotkin v. Sajahtera, Inc.* (2003)

17

106 Cal.App.4th 953, 966.) Thus, "Nolte's allegation that Cedars did not separately and specifically disclose and explain the facilities fee to him was not sufficient to state a claim that the public was likely to be deceived." (*Nolte,* at p. 1409.)

Gray asserts *Nolte* is inapposite because it involved "specific facts and unusual circumstances." Gray points out Nolte did not seek treatment for a medical emergency but consulted a physician at a scheduled time. The physician Nolte consulted was an independent contractor, not a hospital employee. And Nolte signed the hospital's COA "at the doctor's office." (Italics omitted.) Thus, according to Gray, it was the physician, not the hospital, who "had the 'duty' to disclose whatever charges the patient would incur in his 'second opinion' visit." Gray's hospital visit, in contrast, "took place in Dignity's emergency room, and [allegedly] with Hospital personnel."

Gray's effort to distinguish *Nolte* is unavailing. While he may believe Nolte should have directed his nondisclosure claim at the physician he consulted, that is not the claim Nolte brought. With good reason. Nolte was admitted and treated as an outpatient *of Cedars-Sinai*, and his complaint was with a charge *by Cedars* that he claimed should have been separately and specifically disclosed *by Cedars* in *its* COA *prior* to his treatment. This is essentially the same claim Gray advances here—that, prior to providing any emergency medical services, Dignity is required to disclose that its billing for such services will include an ER Charge. The factual distinctions to which Gray points are immaterial.

Indeed, the circumstances in the instant case are even more compelling than those in *Nolte.* Not only did Dignity fully comply with all state and federal disclosure requirements, including the requirement that there be signage in its emergency room departments stating how its pricing information can

18

be accessed (§ 1339.51, subds. (a)(1), (c)), but requiring individualized disclosure that the hospital will include an ER Charge in its emergency room billing, prior to providing any emergency medical services, is at odds with the spirit, if not the letter, of the hospital's statutory and regulatory obligations with respect to providing emergency medical care.

As we have recited, state and federal law governing emergency medical care require California hospitals to provide emergency treatment to *any* person presenting at an emergency department who needs emergency care. (§ 1317, subd. (a); 42 U.S.C. § 1395dd(a).)  Care required to stabilize a patient must be provided *prior* to discussing the patient's ability to pay with the patient or anyone else.  (§ 1317, subd. (d); 42 U.S.C. § 1395dd(h); 42 C.F.R. § 489.24(d)(4)(ii) (2021).)  And after emergency medical care is provided, hospitals must, in their billing, notify patients of the availability of financial assistance.  (§ 127405, subd. (a)(1)(A).)  Together, this multi-faceted statutory and regulatory scheme reflects a strong legislative policy to ensure that emergency medical care is *provided immediately* to those who need it, and that billing disclosure requirements are not to stand in the way of this paramount objective.

It is also telling that in expanding the pricing disclosure obligations of hospitals under the Affordable Care Act, federal regulators took care to ensure that these new obligations do not interfere with the emergency treatment obligations under the EMTALA.  As we have discussed, the new pricing disclosure requirements are focused on "shoppable" medical services, that is, services that can be scheduled in advance and, by definition, are not emergency medical services.  Thus, the new pricing information is to be posted on-

19

line in a readily accessible format for use by consumers *planning* for scheduled medical treatment. People seek emergency medical treatment, in contrast, for serious, and often grave, unplanned accidents or medical calamities.

Moreover, when concern was raised that the new federal disclosure requirements might interfere with a hospital's obligations under the EMTALA—including providing emergency treatment to *any* person who seeks it and providing such treatment *before* any discussion about ability to pay—the CMC stated, "the price transparency provisions . . . do not require that hospitals post any signage or make any statement at the emergency department regarding the cost of emergency care or any hospital policies regarding prepayment of fees or payment of co-pays and deductibles." (84 Fed. Reg. 65536.) And while the CMC lauded hospitals that go beyond posting the new pricing information, the efforts it identified were post-treatment financial counseling and workable payment strategies. (84 Fed. Reg. 65577.) In short, Gray is claiming Dignity owes the very pre-treatment disclosure obligation— by signage and direct verbal communication—the CMC has reassured hospitals does not exist.

Further, Gray claims Dignity owes this pre-treatment disclosure duty in order to accomplish an objective antithetical to state and federal law—to discourage some patients from remaining in the emergency room and receiving medical care. He asserts, for example, that if signage were posted—identifying the cost of each of the five levels of ER Charges (ranging from $984 to $7,356), each level accompanied by a one-word descriptor (ranging from "minor" to "complex/life-threatening"), with a caveat that these are "gross" charges prior to insurance and any other reduction and "[y]our . . . costs may be substantially less"—this would be "particularly beneficial" to patients with

20

"relatively minor ailments" and go a long way towards making emergency departments "less crowded."  Even if lessening the load on our emergency rooms might be a laudable goal, Gray's sweeping assumption that those seeking care at an emergency department can accurately diagnose whether their ailment is "relatively minor" and whether they can safely transport themselves or be transported to a lower acuity facility, is unsupportable.  And while Gray complains this is a "paternalistic" attitude and asserts every person has a right to decide for him or herself whether to seek medical treatment at an emergency department, and to do so based on readily accessible cost information, this disregards the long standing regulatory environment within which emergency departments operate, which emphasizes that no one in need of emergency care should be deterred from receiving it because of its cost.

Thus, while Gray is correct that conduct not expressly prohibited by statute may nevertheless be found to be an "unfair" business practice under the UCL (see, e.g., *Durell, supra,* 183 Cal.App.4th at p. 1359), the alleged conduct must nevertheless meet the substantive definition of an "unfair" practice to be actionable, which the failure to disclose Gray complains of here, does not for the reasons we have discussed.[12]

---

[12]  As we have observed, Gray makes no claim that hospitals cannot include an ER Charge in their billing for emergency department services.  Nor does he claim the "ER LEVEL 2 W/PROCEDU" charge for which he was billed was excessive, or that he was unable to pay it.  Accordingly, the "chargemaster" cases Gray cites do not support the disclosure duty he advocates here.  In those cases, the plaintiffs, most of whom were uninsured, challenged, under a variety of theories, the amounts they were charged and the reasonableness of the hospitals' chargemaster prices. (E.g., *Kendall, supra,* 16 Cal.App.5th at pp. 557, 570–574; *Moran, supra,* 3 Cal.App.5th at p. 1137; *Hale v. Sharp Healthcare* (2010) 183 Cal.App.4th 1373, 1378,

In sum, even giving Gray's allegations their full due, the fact that Dignity did not disclose, prior to providing emergency medical treatment, that its billing for such services would include an ER Charge does not identify a practice that " 'violates established public policy,' " or is " 'immoral, unethical, oppressive or unscrupulous.' " (*Nolte, supra,* 236 Cal.App.4th at pp. 1407–1408.)  We therefore turn to Gray's CLRA claim, which he urges provides a "tether" for his UCL claim.

*The CLRA Claim*

" ' "The [CLRA], enacted in 1970, 'established a nonexclusive statutory remedy for "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer. . . ." [Citation.]' " [Citation.]  "The self-declared purposes of the act are 'to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection.' " ' " (*Bardin v. DaimlerChrysler Corp.* (2006) 136 Cal.App.4th 1255, 1275 (*Bardin*).)

Gray relies specifically on subdivisions (a)(5) and (a)(14) of the CLRA. Subdivision (a)(5) of Civil Code section 1770 prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have. . . ."  Subdivision (a)(14) of Civil Code section 1770 prohibits "[r]epresenting that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law."  Respectively, these subdivisions prohibit "the furnishing of goods or services through misrepresentations" and the "imposition of illegal obligations."  (*Kendall, supra,* 16 Cal.App.5th at p. 566.)

---

disapproved on another ground in *Noel v. Thrifty Payless Inc.*, *supra*, 7 Cal.5th at p. 986, fn. 15.)

Even assuming, without deciding, that Gray adequately alleged standing to assert his CLRA claim,[13] he has not alleged a claim under either subdivision (a)(5) and (a)(14) of Civil Code section 1770.

*Civil Code Section 1770, Subdivision (a)(5) Misrepresentation*

While Gray is correct that a Civil Code section 1770, subdivision (a)(5) "misrepresentation" claim can be based on failure to disclose, this is so in only a specific context—where the defendant has an obligation to disclose a material fact. (*Gutierrez v. Carmax Auto Superstores California* (2018) 19 Cal.App.5th 1234, 1258 (*Gutierrez*) ["subdivision (a)(5), (7) and (9) of Civil Code section 1770 proscribe material omissions in certain situations"].) "[A]n omission is actionable under the CLRA if the omitted fact is (1) 'contrary to a [material] representation actually made by the defendant' or (2) is 'a [material] fact the defendant was obliged to disclose.' " (*Ibid.*) "In the context of the CLRA, a fact is 'material' if a reasonable consumer would deem it important in determining how to act in the transaction at issue. [Citation.] In other words, a defendant has a duty to disclose when the fact is known to the defendant and the failure to disclose it is ' "misleading in light of other facts . . . that [the defendant] did disclose." ' " (*Ibid.*)

---

[13] Under Civil Code section 1780, subdivision (a), CLRA actions may be brought "only by a consumer 'who suffers any damage *as a result of the use or employment*' of a proscribed method, act, or practice. (Italics added.) 'This language does not create an automatic award of statutory damages upon proof of an unlawful act. Relief under the CLRA is specifically limited to those who suffer damage, making causation a necessary element of proof.' [Citation.] Accordingly, 'plaintiffs in a CLRA action [must] show not only that a defendant's conduct was deceptive but that the deception caused them harm.' " (*Buckland v. Threshold Enterprises, Ltd.* (2007) 155 Cal.App.4th 798, 809, overruled on different ground by *Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 335.) A "misrepresentation is material for a plaintiff only if there is reliance—that is, ' " 'without the misrepresentation, the plaintiff would not have acted as he did.' " ' " (*Buckland,* at p. 810.)

23

As the court in *Outboard Marine Corp. v. Superior Court* (1975) 52 Cal.App.3d 30, 36–37 (*Outdoor Marine*)[14], explained, "[i]t is fundamental that every affirmative misrepresentation of fact works a concealment of the true fact. . . . [¶] Fraud or deceit may consist of the suppression of a fact by one who is bound to disclose it or who gives information of other facts which are likely to mislead for want of communication of that fact." (See *Daugherty v. American Honda Motor Co., Inc.* (2006) 144 Cal.App.4th 824, 834 ["the CLRA proscribes a concealment of characteristics or quality 'contrary to that represented,' but in [plaintiff's] case, no representation was made to which the alleged concealment was contrary"].)

Thus, where the plaintiff fails to allege that the defendant "was 'bound to disclose'" the nondisclosed fact or facts showing the defendant "ever gave any information of other facts which could have the likely effect of misleading the public 'for want of communication' of the fact" allegedly not disclosed, a misrepresentation claim under Civil Code section 1770, subdivision (a)(5) has not been stated. (*Bardin, supra,* 136 Cal.App.4th at p. 1276 [defendant had no duty to disclose use of tubular steel exhaust manifolds rather than those made of more durable and more expensive cast iron; therefore failure to disclose such did not state a claim under Civ. Code, § 1770, subd. (a)(5)]; compare *Gutierrez, supra,* 19 Cal.App.5th at p. 1262 [where sales staff advised car " 'was in excellent condition since it passed a rigorous 125-point quality inspection,' " failure to disclose a recall of a stop lamp switch that was " 'a critical safety related component of the . . . braking system' " stated nondisclosure claim under Civ. Code, § 1770, subd. (a)(5)]; *Outdoor Marine, supra,*

---

[14] Superseded by statute on another ground as stated in *Flores v. Southwest Automotive Liquidators, Inc.* (2017) 17 Cal.App.5th 841, 851.

52 Cal.App.3d at p. 37 [representation that "hydrastatic transmission provide[d] 'positive braking' . . . necessarily conceal[ed] that the braking system [was] 'totally defective' " and stated nondisclosure claim under Civ. Code, § 1770, subd. (a)(5)].)

For all the reasons we have discussed in connection with Gray's "unfair" business practice claim, Dignity did not owe Gray the duty he claims was owed in this case—to disclose, prior to providing any medical emergency treatment, that its billing for such treatment would include an ER Charge. We further observe that Dignity *did* disclose all hospital pricing required by statute and regulation, and that its ER Charges were included in those disclosures.

*Civil Code Section 1770, Subdivision (a)(14) Misrepresentation*

Civil Code section 1770, subdivision (a)(14), in turn, embraces "oral misrepresentations or promises concerning the rights, remedies, or obligations under a written contract. . . . By its very language, subdivision (a)(14) . . . contemplates the existence of collateral oral promises, representations or agreements which may be inconsistent with the rights, remedies, or obligations set out in a written contract," and "makes such misrepresentations unlawful." (*Wang v. Massey Chevrolet* (2002) 97 Cal.App.4th 856, 869–870; see, e.g., *Nordberg v. Trilegiant Corp.* (N.D. Cal. 2006) 445 F.Supp.2d 1082, 1098 [defendants' oral representations that plaintiff would be refunded unauthorized charges amounted to a misrepresentation that she had a right to a refund, thus stating a claim under Civ. Code, § 1770, subd. (a)(14)].)

Gray does not allege any collateral oral misrepresentation by Dignity that is at odds with the terms of the hospital's COA. Nor does he allege that Dignity's COA contains any term prohibited by law. The only allegation Gray makes with respect to the hospital's COA is that "under Hospital's Contract,"

25

he is assertedly "not required to pay" the "undisclosed" ER Charge.  At most, he has alleged a breach of contract, which, alone, is not sufficient to state a claim under Civil Code section 1770, subdivision (a)(14).  (See *Baba v. Hewlett-Packard Co.* (N.D. Cal., June 16, 2010, No. C 09-05946 RS) 2010 WL 2486353 at p. *4.)

In sum, Gray's assertion that Dignity failed to disclose, prior to providing any medical emergency treatment, that its billing for such treatment would include an ER Charge, does not, under either Civil Code section 1770, subdivision (a)(5) or (a)(14), state a CLRA claim.

*Declaratory/Injunctive Relief Claim*

Gray's claim for declaratory and injunctive relief has no independent vitality apart from his UCL and CLRA claims.  Rather, it is a request for particular forms of equitable relief.  (See *Green Valley Landowners Assn. v. City of Vallejo* (2015) 241 Cal.App.4th 425, 433, fn. 8.)  Since his UCL and CLRA claims fail, so too does his request for declaratory and injunctive relief.

## DISPOSITION

The judgment is AFFIRMED.  Respondent to recover costs on appeal.

_____
Banke, J.

We concur:


_____
Humes, P.J.


_____
Margulies, J.

A158648, Gray v. Dignity Health

Trial Court:        San Francisco City and County Superior Court

Trial Judge:        Hon. Mary E. Wiss

Counsel:

Carpenter Law, Gretchen A. Carpenter; Law Offices of Barry L. Kramer, Barry Kramer for Plaintiff and Appellant.

Manatt, Phelps & Phillips, LLP, Barry S. Landsberg, Harvey L. Rochman, Joanna Sobol McCallum for Defendant and Respondent.